United States District Court
Southern District of Texas

**ENTERED**

March 25, 2026

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BNI FRANCHISING, LLC, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. H-24-3126 |
| | § | |
| NETWORK FOR ACTION INTL., LLC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

This dispute arises from the business equivalent of social networking or dating sites. BNI Franchising, LLC, and BNI Global, LLC (collectively "BNI") and Network in Action INTL., LLC ("NIA") are competing business networking companies. BNI sued NIA, initially asserting claims for misappropriation of trade secrets, tortious interference with contract, and federal trademark infringement. (Docket Entry No. 1). The court later granted in part and denied in part NIA's motion to dismiss. (Docket Entry No. 20). BNI is now on its third amended complaint, (Docket Entry No. 71), and NIA is on its first amended counterclaims. (Docket Entry No. 47). Each side has moved to dismiss the other side's latest pleadings. (Docket Entry Nos. 53, 74). BNI has also moved for partial summary judgment. (Docket Entry No. 88). NIA's response is not yet due, but the part of BNI's motion for summary judgment related to computer trespass is now moot because that claim has been dismissed.

The court grants in part and denies in part NIA's motion to dismiss BNI's third amended complaint and grants BNI's motion to dismiss NIA's amended counterclaims. NIA may have one more chance to amend its counterclaims and must do so no later than April 17, 2026.

The reasons for these rulings are explained below.

## I.    Background

BNI was founded in 1984. (Docket Entry No. 71 ¶ 12). It identifies its "mission" as helping its members "increase their business through a structured, positive, and professional referral marketing program that enables them to develop long-term, meaningful relationships with quality business professionals." (*Id.*). BNI has more than 300,000 active members and 11,000 global chapters. (*Id.*). BNI or its franchisees run local BNI chapters. (*Id.* ¶ 15). BNI membership is invite-only and includes an application and an interview with the relevant chapter's membership committee. (*Id.*).

BNI's agreements with its members require the members to abide by the BNI Member Policies and Guidelines and Code of Ethics. (Docket Entry No. 71 ¶ 16). The Policies prohibit belonging to another referral network. (*Id.*). BNI Franchisees enter into a "BNI Franchise Agreement" with BNI, which cannot be terminated for five years. Each agreement requires the franchisees to keep certain materials confidential; prevents franchisees from using or duplicating knowledge or experience received from BNI for use other than for the operation of a BNI franchise; and prohibits franchisees from owning an interest in, conducting or operating, and being employed or associated with another business-referral network. (*Id.* ¶¶ 17–20). Finally, BNI's employees sign a "BNI Employment Agreement" with BNI. (*Id.* ¶ 22). The agreements for BNI employees

2

who have access to confidential business information and trade secrets include non-disclosure, non-compete, and non-solicitation requirements. (*Id.* ¶¶ 23, 24). BNI's revenue is derived from its members and franchisees. (*Id.* ¶ 21).

NIA is allegedly BNI's primary rival in the business networking market. (Docket Entry No. 47 ¶ 1). NIA has 188 chapters in 25 states with approximately 2,400 members total. (*Id.* ¶ 17). BNI alleges that that NIA has recently shifted its marketing strategies to focus "almost entirely" on attacking, undermining, interfering with, and poaching resources from BNI. (Docket Entry No. 71 ¶ 25). BNI alleges that NIA's "model for growing its business" is to "scrape" information from BNI's websites and sell it to NIA franchise owners, who use that information to "poach" BNI employees and members. (*Id.* ¶ 30). When BNI filed its third amended complaint, at least 23 NIA franchise owners were previously BNI members or employees, some of them former leaders. (*Id.* ¶ 31). NIA advertises its successful solicitation of former BNI members and leaders on its website. (*Id.* ¶ 34–37). BNI alleges that NIA has used the confidential materials it obtained from former BNI affiliates to "unfairly compete" against BNI and "to continue its solicitation and unfair competition scheme." (*Id.* ¶ 39).

NIA in turn accuses BNI of engaging in anti-competitive behavior. NIA alleges that in February 2023, BNI's Chief Development Officer, Michael Walchonski, contacted NIA's founder, Scott Talley, to discuss BNI's potential acquisition of NIA. (Docket Entry No. 47 ¶ 21). Talks continued for several months. (*Id.* ¶¶ 22, 23). In April 2023, Talley rejected BNI's offer. (*Id.* ¶ 24). In June 2023, BNI's counsel sent a cease-and-desist letter to NIA, stating that BNI had learned that many of its members had received targeted emails from NIA and that while BNI's list

of members is public, those members' contact information is not. (Docket Entry No. 47-1). BNI alleged that NIA must have misappropriated BNI's membership directory, among other misconduct. (*Id.*). In October 2023, Talley asked Walchonski whether BNI was still interested in acquiring NIA. (Docket Entry No. 47 ¶ 25). Talks between Walchonski and Talley resumed from October 2023 to January 2024. (*Id.* ¶ 26). Shortly after a March 2024 meeting, Walchonski informed Talley that BNI would not proceed with its attempt to acquire NIA. (*Id.* ¶ 28). BNI filed this lawsuit in August 2024.

BNI's initial lawsuit asserted causes of action for tortious interference with contract, violation of the Defend Trade Secrets Act ("DTSA"), violation of the Texas Uniform Trade Secrets Act ("TUTSA"), and federal trademark infringement. (Docket Entry No. 1). The court granted in part and denied in part NIA's first motion to dismiss, denying the motion as to the trademark misappropriation and trademark infringement claims but granting it as to the tortious interference claim. (Docket Entry No. 20). NIA then answered and asserted counterclaims for monopolization and attempted monopolization under § 2 of the Sherman Act, § 15.05(b) of the Texas Antitrust Act, and for unfair competition under Texas common law. (Docket Entry No. 24). BNI filed its first amended complaint, and both sides filed motions to dismiss. (Docket Entry Nos. 31, 32, 33). At a hearing on May 1, 2025, the court granted both sides leave to amend. (Docket Entry No. 46). BNI then filed its second amended complaint and NIA filed its amended counterclaims. (Docket Entry Nos. 47, 48). Both parties again filed motions to dismiss. (Docket Entry Nos. 52, 53). The court later granted BNI leave to file a third amended complaint. (Docket Entry No. 70).

4

BNI's third amended complaint is the operative complaint.  This version of the complaint centers heavily on BNI's assertion that NIA "scraped" member records off BNI's websites, in violation of BNI's Terms of Service, and used these records to improperly solicit BNI members. BNI alleges that on July 10, 2023, NIA scraped approximately 72,276 member records from the BNI America website; that between July 10, 2023, and June 1, 2025, NIA scraped data from the BNI America website at least 45 times; and that, in total NIA has scraped information off BNI's websites at least 140 times.  (Docket Entry No. 71 ¶¶ 41–45).  A link to BNI's Terms of Service was in the footer of all subpages of BNI's websites.  (*Id.* ¶ 51).  The Terms of Service provided that a user agreed not to use BNI's sites to send any kind of solicitation.  (*Id.* ¶ 52).  The Terms of Service also required that a user agree not to use "Relationship Data" without written consent.  (*Id.* ¶ 53).  Finally, the Terms of Service required each user to agree not to "sell, resell, reproduce, duplicate, distribute, copy, or use for any commercial purpose any portion of" the sites.  (*Id.* ¶ 54). BNI alleges that NIA violated each of these Terms.

BNI's third amended complaint asserts eight causes of action: (1) tortious interference with contract; (2) violation of the DTSA; (3) violation of the TUTSA; (4) federal trademark infringement under 15 U.S.C. § 1114(1)(A);  (5) breach of contract under North Carolina law; (6) computer trespass under North Carolina law, N.C. Gen. Stat. § 14-458(a)(5); (7) common law misappropriation; and (8) unfair competition under Texas law.  (Docket Entry No. 71 ¶¶ 113–224). BNI seeks damages and permanent injunctive relief.  (Docket Entry No. 71 at 39).  On February 26, 2026, the parties stipulated to the dismissal with prejudice of the DTSA and TUTSA claims. (Docket Entry No. 87).  NIA has moved to dismiss the remaining claims.  (Docket Entry No. 74).

NIA's amended counterclaims allege: (1) monopolization under the Sherman Antitrust Act § 2; (2) attempted monopolization under the Sherman Antitrust Act § 2; (3) monopolization and attempted monopolization under the Texas Antitrust Act, Tex. Bus. & Com. Code § 15.05(b); and (4) unfair competition. (Docket Entry No. 47). NIA seeks a declaratory judgment, injunctive relief, and damages. (*Id.* at 23). BNI has moved to dismiss the amended counterclaims. (Docket Entry No. 53).

## II.    The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*,

924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quotation marks omitted, alterations adopted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co*., 920 F.3d 890, 900 (5th Cir. 2019).

## III.    Analysis

### A.  BNI's Claims against NIA

#### 1.  The Tortious Interference with Contract Claim

"In Texas, to prove tortious interference with a contract, a plaintiff must show '(1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss.'" *Ancor Holdings, L.P. v. Landon Cap. Partners, L.L.C.*, 114 F.4th 382, 398 (5th Cir. 2024) (quoting *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017)). "The defendant must have actual knowledge of the contract in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of a contract." *Id.* at 398–99. "The plaintiff is not required to prove the defendant's intent to injure, only that the defendant 'desires to cause the

consequences of his act' or 'believes that the consequences are substantially certain to result from it.'"  *Id.* at 399 (quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)).

BNI alleges that NIA has tortiously interfered with three different sets of BNI contracts: its Employee Agreements, its Member Agreements, and its Franchise Agreements.  (Docket Entry No. 71 ¶ 114).  BNI alleges that NIA knew the terms of these agreements, in part because it has similar agreements and because NIA has many individuals in its leadership who were formerly affiliated with BNI.  (*Id.* ¶ 115).  BNI alleges that its Franchise Agreements include provisions prohibiting a franchisee from belonging or owning a franchise for another network referral organization.  (*Id.* ¶ 119).  BNI alleges that its Member Agreements similarly prohibit membership in a competing organization, such as NIA.  (*Id.* ¶ 121).  BNI alleges that NIA has induced BNI employees, franchisees, and members to breach their agreements with BNI.  (*Id.* at ¶¶ 116–21).

NIA responds that BNI has failed to plead the second element of tortious interference because there is no allegation that NIA willfully or intentionally interfered in any of the three sets of BNI agreements.  (Docket Entry No. 74 at 15).  NIA also asserts that BNI has failed to allege that NIA knew of "any specific provision in any specific contract" and that, in any event, BNI had failed to plead proximate cause or actual damages.  (*Id.* at 16).

The court denies the motion to dismiss the claim for tortious interference with contract.[1] The first element is not in dispute.  BNI has identified three contracts that NIA allegedly interfered

---

[1] BNI argues that NIA has waived its challenges to the tortious interference and trademark infringement claims by failing to move to dismiss identical claims that BNI had presented in its first amended complaint.

with: the Member Agreements, the Franchise Agreements, and the Employee Agreements. As to the second element, BNI has sufficiently pleaded NIA's tortious intent. NIA argues that BNI "simply strings together lawful career moves," (Docket Entry No. 74 at 15), but the third amended complaint specifically alleges that NIA knew of the contracts and intentionally tried to undermine them. For example, the third amended complaint alleges that, in one instance of soliciting a BNI franchisee, NIA offered to pay litigation costs, demonstrating that it knew that soliciting a franchisee involved asking the franchisee to violate contractual provisions. (Docket Entry No. 71 ¶ 86). The third amended complaint also asserts that NIA's website provided strategies for avoiding the exclusivity provisions in BNI's member contracts. (*Id.* ¶ 110). Several former BNI employees who joined NIA are also alleged to have been involved in soliciting and encouraging BNI members, employees, and franchisees to break their agreements with BNI. (*Id.* ¶¶ 102, 115).

As to the third and fourth elements, BNI alleges that NIA's website documents dozens of individuals who left BNI to join NIA. (Docket Entry No. 71 ¶ 34). BNI alleges that, upon information and belief, those individuals were solicited by NIA to leave BNI. (*Id.*). BNI also alleges that NIA's solicitation "induced" various BNI members, employees, and franchisees to breach their agreements. (*Id.* ¶ 116). NIA responds that BNI's allegations "describe nothing more than legitimate marketplace competition." (Docket Entry No. 74 at 16). This response fails to take into account BNI's allegations that NIA was not merely soliciting consumers to buy another

---

(Docket Entry No. 76 at 24). Instead, NIA moved to dismiss only the breach of contract claim in BNI's first amended complaint. The court notes, however, that NIA challenged these claims in its motion to dismiss BNI's original complaint, (Docket Entry No. 12), and that NIA's motion to dismiss BNI's first amended complaint became moot when BNI amended again. NIA did not waive its right to challenge the tortious interference and trademark infringement claims in BNI's third amended complaint.

product on an open market, but was soliciting BNI members, franchisees, and employees to breach specific provisions in their agreements with BNI. That is sufficient to allege that NIA engaged in wrongful actions that proximately caused NIA competitive harm. *See Ancor Holdings, L.P.* at 400 ("To establish proximate cause, a party must show that the defendant took an active part in persuading a party to a contract to breach it."). Finally, BNI alleges that, in addition to the breached contracts, NIA's solicitation of BNI's members and leaders has required BNI to make "large expenditures of resources." (*Id.* ¶ 33). BNI has sufficiently pleaded that NIA's conduct caused BNI to suffer damages. *See, e.g.*, *Leonardo Worldwide Corp. v. Pegasus Sols., Inc.*, No. 3:14-CV-2660, 2015 WL 13469916, at *4 (N.D. Tex. Jan. 9, 2015) (holding that a hotel's allegation that it had to spend "hundreds of hours" correcting misrepresentations and fixing relationships, alongside premature termination of a contract, sufficed to plead actual damages).

NIA's motion to dismiss BNI's tortious interference claim is denied.

### 2. The Federal Trademark Infringement Claim

BNI pleaded a federal trademark infringement claim in its original complaint, (Docket Entry No. 1 ¶¶ 71–78), and NIA challenged the claim in its initial motion to dismiss, (Docket Entry No. 12 at 21). The court denied the motion to dismiss the claim. (Docket Entry No. 20). BNI reasserted the claim in its third amended complaint, (Docket Entry No. 71 ¶¶ 147–154), and NIA again moved to dismiss, (Docket Entry No. 74 at 19). "Generally, 'when a court decides' an issue, 'that decision should continue to govern the same issues in subsequent stages of the same case.'" *In re AKD Invs.*, 79 F.4th 487, 491 (5th Cir. 2023) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). "However, the law-of-the-case doctrine does not operate to prevent a district court

from reconsidering prior rulings." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010). "[W]hen the [c]ourt is wrong, it can—and, if practicable, will—set things right." *McPeters v. LexisNexis*, 11 F. Supp. 3d 789, 795 (S.D. Tex. 2014).[2] NIA has provided no persuasive reason for the court to depart from its prior ruling. But because the court denied the motion to dismiss the trademark infringement claim in an oral ruling and did not issue a written opinion, the court explains why it continues to deny NIA's attempt to dismiss this claim.

"The two elements of a federal trademark infringement claim are (1) the plaintiff owns a legally protectible mark, and (2) the defendant is infringing the trademark and causing a likelihood of confusion." *World Igbo Cong. Inc. v. Nwaguru*, No. CIV.A. H-14-3213, 2015 WL 1097382, at *1 (S.D. Tex. Mar. 11, 2015) (citing *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236–37 (5th Cir. 2010)). "The nominative fair use doctrine provides that 'one who has lawfully copied another's product can tell the public what he has copied.'" *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 488 (5th Cir. 2008) (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 539 (5th Cir. 1998)). "The right of fair use is limited, however, insofar as 'the use cannot be one that creates a likelihood of confusion as to source, sponsorship, affiliation, or approval.'" *Id.* (quoting *Pebble Beach*, 155 F.3d at 539).

The third amended complaint alleges that BNI owns "the federally registered trademark GIVERS GAIN (Reg. No. 3,069,990)." (Docket Entry No. 71 ¶ 148). NIA does not contest that BNI owns this trademark but argues that BNI's general assertion that NIA's use of the mark on its

---

[2] The law-of-the-case doctrine is an impediment to a district court's ability to change its mind only when the issue has already been decided on appeal. *See McPeters*, 11 F. Supp. 3d at 795.

website "has caused and is likely to cause confusion" is "precisely" the kind of bare-bones allegation that fails to meet the *Twombly* and *Iqbal* pleading standards.  (Docket Entry No. 74 at 20).  NIA also asserts that it used the "GIVERS GAIN" mark only to distinguish its offerings from BNI's and that the mark was displayed with proper attribution to BNI.  (*Id.* at 21).

BNI has asserted more facts than NIA acknowledges.  The third amended complaint alleges that NIA's website repeatedly used the identical "GIVERS GAIN" mark in connection with NIA's purported "networking certification" services.  (Docket Entry No. 71 ¶ 150).  BNI alleges that it did not consent to NIA's use of this mark, which has caused and will continue to cause confusion by leading the public to believe that BNI has authorized, sponsored, or approved NIA's services when it has not done so.  (*Id.* ¶¶ 151, 152).  BNI alleges that this confusion results in NIA "illegally benefitting from BNI's goodwill."  (*Id.* ¶ 152).  BNI asserts that NIA's conduct was done knowingly and that BNI has suffered harm as a result.  (*Id.* ¶¶ 153–54).

These allegations are sufficient to overcome dismissal of BNI's trademark infringement claim.  BNI's allegations regarding consumer confusion are not "implausible" as pleaded.  *See Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 428–29 (5th Cir. 2021) (although trademark infringement cases can sometimes be decided at the motion to dismiss stage, doing so is only appropriate where, for example, "the factual allegations regarding consumer confusion are implausible"); *World Igbo Congress Inc.*, 2015 WL 1097382, at *2 (the plaintiff's assertion that the defendant's use of a trademark without authority was "causing confusion and the diminution of . . . goodwill" was sufficient to avoid dismissal); *Sherri Hill, Inc. v. Amarra USA LLC*, No. 1:20-CV-350-LY-ML, 2021 WL 8083342 (W.D. Tex. July 26, 2021), *report and recommendation*

*rejected on other grounds*, No. A-20-CV-00350-LY, 2021 WL 8083343 (W.D. Tex. Sep. 21, 2021) (noting that the defendant had not, and seemingly could not, provide any cases applying the nominative fair use defense at the motion to dismiss stage); *cf. Hensley Mfg. v. ProPride Inc.*, 579 F.3d 603, 610–12 (6th Cir. 2009) (granting a motion to dismiss a trademark infringement claim in part because the defendant's advertisements and other materials made clear that the two companies were not currently associated or affiliated).

### 3. Breach of Contract Under North Carolina Law

BNI also asserts a breach of contract claim under North Carolina law.[3] (Docket Entry No. 71 ¶ 157). This claim revolves around NIA's alleged scraping of BNI's websites, in violation of BNI's Terms of Service. "Under North Carolina law, a breach of contract claim involves two elements: (1) the existence of a valid contract and (2) breach of the terms of that contract." *Popper v. Hartford Fin. Servs. Grp.*, 682 F. Supp. 3d 469, 477 (E.D.N.C. 2023). A plaintiff does not need to allege actual damages to state a claim. *See Superior Performers, LLC v. Carey*, 716 F. Supp. 3d 373, 378–79 (M.D.N.C. 2024); *Staffing Advantage LLC v. Definitive Staffing Sols., Inc.*, 7:20-

---

[3] NIA does not specifically argue that North Carolina law does not apply to this claim but rather asserts that under either North Carolina or Texas law, the breach of contract claim fails. (Docket Entry No. 74 at 22). The Terms of Service state that "[t]he laws of the State of North Carolina govern [the Terms of Service] without giving effect to principles of conflicts of laws." (Docket Entry No. 71 at 72). (The Terms of Service also have a venue provision, but no party has argued that this case should be transferred to North Carolina). North Carolina and Texas law do appear to differ in that Texas requires a plaintiff to plead damages. Because the choice-of-law clause is functionally uncontested, "the court will assume *arguendo*" that BNI is correct that North Carolina law applies to the breach of contract claim. *Cosgrove v. Epsilon Data Mgmt., LLC*, No. 3:25-CV-0970-D, 2025 WL 1592954, at *2 n.4 (N.D. Tex. June 5, 2025). Regardless, the court concludes that under either North Carolina or Texas law, this claim may proceed.

13

CV-150, 2021 WL 2426360, at *6 n.7 (E.D.N.C. June 14, 2021) (collecting cases and asserting that "North Carolina case law stands for the proposition that actual damages from the alleged breach is not an element of a breach-of-contract claim that must be pleaded").

NIA argues that there was no contract it could have breached for most of the relevant period because BNI's Terms of Service are unenforceable browse-wrap terms that lack mutual assent and consideration.[4] (Docket Entry No. 74 at 11). NIA does not dispute that it had actual notice of the Terms of Service as of January 28, 2025, when BNI explicitly mentioned the Terms of Service in its first amended complaint,[5] but argues that the breach of contact claim must nonetheless be dismissed because BNI has not sufficiently pleaded damages. (Docket Entry No. 74 at 24). BNI responds that it has sufficiently alleged constructive and actual knowledge, pointing to its allegation that several NIA franchisees' websites have similar terms of service located in their footers of their webpages, the same location in which BNI places its Terms of Service. (Docket Entry No. 76 at 15–16; Docket Entry No. 71 ¶ 69). BNI also asserts that it has sufficiently alleged "non-speculative damages" to survive a motion to dismiss. (Docket Entry No. 76 at 13).

"Browsewrap provisions differ from clickwrap because they operate under the theory that the user accepts a website's terms of use merely by browsing the site." *Weeks v. Interactive Life*

---

[4] Browse-wrap agreements, unlike clickwrap agreements, "do not require the user to manifest assent to the terms and conditions of a website expressly." *Jones v. Homeaglow Inc.*, No. 3:25-cv-00249-S, 2025 WL 2816792, at *4 (N.D. Tex. Oct. 1, 2025) (cleaned up). "A browsewrap agreement typically involves a situation where a notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Id.* (cleaned up).

[5] The original complaint did not have a breach of contract claim. (*See generally* Docket Entry No. 1).

*Forms, LLC*, 100 Cal. App. 5th 1077, 1085 (2024) (cleaned up).  For a browse-wrap agreement to be enforceable, there "must be separate evidence of the purchaser's actual or constructive knowledge of the terms" contained in the agreement.  *See Bergenstock v. LegalZoom.com, Inc.*, No. 13 CVS 15686, 2015 WL 3866703 (N.C. Super. Ct. June 23, 2015); *see also Widespread Elec. Sales, LLC v. Upstate Breaker Wholesale Supply, Inc.*, No. 3:20-CV-2541, 2021 WL 2651087, at *5 (N.D. Tex. June 28, 2021) ("[T]o plead a plausible breach of contract claim based on a browsewrap agreement, Plaintiff must allege that Defendant had actual or constructive knowledge of it to show a valid contract exists.").

The court denies the motion to dismiss the breach of contract claim.  In its third amended complaint, BNI describes how NIA obtained constructive or actual knowledge.  "Unlike several other cases in which courts have found a plaintiff's allegations insufficient to survive a motion to dismiss," BNI has "alleged more than the mere existence of a link at the bottom" of its website. *AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 510–11 (W.D. Va. 2013).  For example, BNI asserts that many NIA franchisees' websites have "identical" terms of service.  (Docket Entry No. 71 ¶ 69).  BNI alleges that these franchisees place these terms of service in places on their websites similar to where BNI places the link to its Terms of Service on its websites.  (*Id.*).  BNI alleges that upon information and belief, NIA has discretion over, and exercises some control over, the franchisee websites.   (Docket Entry No. 71 ¶ 70).   Courts have found similar assertions sufficient to move past the motion to dismiss stage.  *See, e.g. Andra Group, LP v. BareWeb, Inc.*, No. 4:17-CV-00815, 2018 WL 2848985, at *9 (E.D. Tex. June 11, 2018) (assertion that the defendant had a similar "Terms of Use" in a similar location on its website was sufficient to state

15

a claim); *DHI Grp., Inc. v. Kent*, Civ. Action No. H-16-1670, 2017 WL 4837730, at *3 (S.D. Tex. Oct. 26, 2017) (similar); *cf. Be In, Inc. v. Google Inc.*, No. 12-CV-03373, 2013 WL 5568706, at *8 (N.D. Cal. Oct. 9, 2013) (granting the motion to dismiss because the second amended complaint merely asserted that the defendants agreed to the terms of service by visiting a website).[6] BNI also asserts that NIA's web scraping tool was tailored to the BNI websites, which "required knowledge of the contents and design of the BNI websites." (Docket Entry No. 71 ¶ 63). These assertions are sufficient to plead knowledge at this early stage.

BNI's factual assertions as to damages are also sufficient. As noted above, North Carolina law does not appear to require a plaintiff to plead actual damages. Even if Texas law applied and required BNI to have pleaded damages, the third amended complaint is sufficient. *See Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (the elements of a breach of contract claim under Texas law are "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach"). "Under Texas law, the measure of breach-of-contract

---

[6] NIA's supporting cases are distinguishable. As a basic matter, many of its citations in support of the unenforceability of browsewrap agreements were not cases involving a motion to dismiss. For example, *Nguyen v. Barnes & Noble Inc.* concerned a motion to compel arbitration. 763 F.3d 1171 (9th Cir. 2014). Meanwhile, *Masry v. Lowe's Co. Inc.*, reviewed the browsewrap agreement at issue in the context of a motion to transfer. No. 24-cv-00750, 2024 WL 3228086, at *5–6 (N.D. Cal. June 28, 2024). And *Widespread Electric Sales, LLC* actually undercuts NIA's argument: in that case, the browsewrap-based claim was dismissed because the plaintiff failed to assert knowledge altogether, and the court distinguished the plaintiff's complaint from cases in which knowledge was asserted in at least some form. 2021 WL 2651087, at *5. Another case, *Cvent, Inc. v. Eventbrite, Inc.*, is similarly distinguishable because BNI has asserted far more bases for knowledge than did the plaintiff in that case. 739 F. Supp. 2d 927, 937 (E.D. Va. 2010) (statement that the terms of service were "readily available for review" without any other factual assertions was insufficient).

damages is 'just compensation for the loss or damage actually sustained.'" *Amigo Broadcasting, LP v. Spanish Broadcasting Sys., Inc.*, 521 F.3d 472, 482 (5th Cir. 2008) (quoting *Stewart v. Basey*, 245 S.W.2d 484 (Tex. 1952)).  The third amended complaint asserts that BNI lost profits because NIA improperly solicitated BNI members to join NIA.  (Docket Entry No. 71 ¶ 187).  BNI has sufficiently pleaded that it lost revenues and profits, and incurred costs to maintain its membership, when NIA used BNI's member information, alleged obtained in violation of the Terms of Service, to solicit BNI's members to join NIA.

### 4.  Computer Trespass Under North Carolina Law

North Carolina's computer trespass statute "prohibits a person from using 'a computer or computer network without authority and with the intent to . . . [m]ake or cause to be made an unauthorized copy' of information residing there."  *dmarcian, Inc. v. DMARC Advisor BV*, No. 1:21-cv-00067-MR, 2024 WL 1916715, at *17 (W.D.N.C. May 1, 2024) (quoting N.C. Gen. Stat. § 14-458(a)).  "[A] person is 'without authority' when . . . the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission[.]"  N.C. Gen. Stat. § 14-458(a).  BNI's computer trespass claim is based on the same allegations as its breach of contract claim: that on at least 140 separate occasions, NIA scraped data from public BNI websites in violation of BNI's Terms of Service.  (*Id.*).  NIA argues that the computer trespass claim must be dismissed because "unauthorized access" requires the

circumvention of credentials or other technological barriers and that scraping publicly available webpages does not meet this standard.[7]  (Docket Entry No. 72 at 11).

The court grants NIA's motion to dismiss this claim.  "There is very little guidance from North Carolina courts on how a civil claim for computer trespass should be analyzed at the 12(b)(6) stage."  *Constr. Managers, Inc. of Goldsboro v. Amory*, 18 CVS 1359, 2019 WL 2167311, at *17 (N.C. Super. Ct. May 17, 2019).  In the cases that BNI cites, however, and the cases that this court could find, an individual had been affirmatively granted rights and permissions and then exceeded them, in violation of the statute.  *See, e.g.*, *id.* at *16–17 (an employee was granted broad access to the plaintiffs' files as part of his job, then used his company computer to download files to his personal device without authority to do so); *CHGYM LLC v. Unify Athletics, LLC*, No. 1:21CV911, 2022 WL 112208, at *5–6 (M.D.N.C. Jan. 12, 2022) (an employee had full access to databases, but exceeded the scope of his authority by using those databases to create reports he did not have the authority to create); *Spirax Sarco v. SSI Eng'g*, 122 F. Supp. 3d 408, 418 (E.D.N.C. 2015) (an employee used his work laptop to download large quantities of computer files to his personal devices and Dropbox in violation of company policy); *Encompass Servs, PLLC v. Master Consulting P.A.*, 19 CVS 1782, 2021 WL 2655164, at *16 (N.C. Super. Ct. June 28, 2021) (a former employee downloaded his Outlook account, including confidential information, to an

---

[7] NIA also argues that this computer trespass claim fails because the browse-wrap agreement did not create a binding contract, and so the choice of law clause contained in the Terms of Service cannot provide a basis for this court to apply North Carolina substantive law to other contract-related claims.  (Docket Entry No. 78 at 14).  For the reasons explained above, BNI has adequately pleaded a breach of contract claim, although it is not clear that this statutory claim would fall within the scope of the choice of law clause.  In any event, the court need not reach this ground to dismiss the claim.

external storage device, allegedly without authority to do so); *Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC*, No. 22 CVS 4285, 2024 WL 3549145, at *45 (N.C. Super. Ct. July 12, 2024) (former employees exceeded access they were provided); *Tech. Partners, Inc. v. Papaioannou*, No. 3:15-CV63, 2015 WL 9304562, at *1 (W.D.N.C. Dec. 21, 2015) (same); *dmarcian, Inc.*, 2024 WL 1916715, at *17 (the defendant downloaded source code from the plaintiffs after the plaintiffs told the defendant that it was terminating their agreement); *Sirona Dental, Inc. v. Smithson*, 3:14-cv-00714, 2018 WL 1567370, at *10 (W.D.N.C. Mar. 30, 2018) (a former employee deleted the company's data from his work laptop before returning it); *McKeown v. Tectran Mfg., Inc.*, No. 5:17-cv-00109, 2018 WL 2207139, at *3 (W.D.N.C. May 14, 2018) (same); *MarketPlace 4 Ins., LLC v. Vaughn*, 22 CVS 7588, 2023 WL 2229694, at *3 (N.C. Super. Ct. Feb. 24, 2023) (a former employee repeatedly accessed former employer's systems after departing the company).

BNI has pointed to no case law, and this court could find none, applying or justifying its extraordinarily broad interpretation of the statute. BNI's interpretation would transform garden-variety claims that terms of service were violated based on access to a publicly available website into a computer trespass claim. There is no basis for such a broad application. *See CHGYM LLC*, 2022 WL 112208, at *6 (concluding that the employee was acting "without authority" as defined by the statute specifically because he was not acting in furtherance of his tasks and duties as an employee, for which he was granted access to the databases, when he generated the unauthorized reports). This claim is dismissed, with prejudice, because amendment would be futile.

### 5. The Common-Law Misappropriation Claim

19

NIA argues that BNI's common law misappropriation claim is preempted and duplicative. (Docket Entry No. 74 at 26). "The elements of the tort of unfair competition by misappropriation, also called 'common law misappropriation,' are '(1) the creation of plaintiff's product (i.e., the trade secret information) through extensive time, labor, skill, and money; (2) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff.'" *Baylor Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 287 (Tex. App.—Tyler 2021, pet. denied) (quoting *BP Automotive, L.P. v. RML Waxahachie Dodge, L.L.C.*, 448 S.W.3d 562, 572 (Tex. App.—Houston [1st Dist.] 2014, no pet.)). Unlike trade-secret misappropriation, "common-law misappropriation requires no secrecy but requires the use of the misappropriated item in competition with its creator." *BioTE Med., LLC v. Medcalf*, No. 05-20-00661-CV, 2022 WL 18007665, at *12 (Tex. App.—Dallas Dec. 30, 2022, no pet.) (per curiam) (mem. op.).

The TUTSA claim—which the parties have stipulated to dismiss with prejudice—was based on the theory that NIA improperly accessed BNI's "trade-secret information," which included its member lists. (Docket Entry No. 71 ¶¶ 137, 140). As presented in the third amended complaint, BNI's common law misappropriation claim appears to rest on an assertion "that the misappropriated information was not a trade secret but was confidential." *AMID, Inc. v. Medic Alert Found. U.S. Inc.*, 241 F. Supp. 3d 788, 827 (S.D. Tex. 2017). The third amended complaint alleges that "BNI created and compiled its member lists through extensive time, labor, effort, skill,

20

and money." (Docket Entry No. 71 ¶ 208). BNI alleges that NIA used the lists to unfairly compete with BNI, requiring BNI to expend resources and to lose members. (*Id.* ¶¶ 33, 201, 209).

BNI's common-law misappropriation claim can proceed. The now-dismissed TUTSA claim and the common-law misappropriation claim are (or, at least, were) "alternative theories of relief." *AMID, Inc.*, 241 F. Supp. 3d at 827. BNI can "recover on its tort claim without proving that the information is protected as trade secrets." *Id.*; *AWP, Inc. v. Commonwealth Excavating, Inc.*, No. 5:13cv031, 2013 WL 3830500, at *3 (W.D. Va. July 24, 2013); *see also BP Auto., L.P.*, 448 S.W.3d at 572 (denying a no-evidence motion for summary judgment on an unfair competition by misappropriation claim when the plaintiff had produced evidence that the defendant "participated in unfair competition by misappropriating its customer lists"). NIA's motion to dismiss the common law misappropriation claim is denied.

### 6. The Unfair Competition Claim

Finally, BNI asserts an unfair competition claim based on NIA's tortious interference, trade secret misappropriation, computer trespass, and common-law misappropriation. (Docket Entry No. 71 ¶¶ 217–220). NIA has moved to dismiss the unfair competition claim because unfair competition "is not an independent tort" and because BNI pleads no independent wrongful act that survives dismissal. (Docket Entry No. 74 at 28).

"Unfair competition under Texas law is 'the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Orthoflex, Inc. v. ThermoTek, Inc.*, 983 F. Supp. 2d 866, 882 (N.D. Tex, 2013). "In Texas, the tort of unfair competition covers conduct that is contrary to honest business

21

practices or commercial matters and is a derivative tort requiring a viable underlying tort or other illegal conduct for liability to exist." *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 583 (N.D. Tex. 2024) (cleaned up). "Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F. 3d 465, 486 (5th Cir. 2000).

"Practices falling under unfair competition include 'trademark infringement, dilution of good will, misappropriation of business value, palming off, passing off, and theft of trade secrets.'" *Centennial Bank*, 717 F. Supp. 3d at 583 (quoting *Baylor Scott & White*, 633 S.W. 3d at 286). "[A] claim for unfair competition and a claim for common law misappropriation may be based on the same factual predicate." *Reed Migraine Ctrs. of Tex., PLLC v. Chapman*, No. 3:14-CV-1204-N, 2015 WL 11120872, at *4 (N.D. Tex. Sep. 22, 2015). Because BNI has sufficiently pleaded several underlying torts and wrongful acts, including tortious interference with business relationships, the unfair competition claim may proceed. *See, e.g.*, *Well Cell Glob. LLC v. Calvit*, Civ. Action No. H-22-3062, 2023 WL 175193, at *8 (S.D. Tex. Jan. 12, 2023) ("Well Cell has successfully pleaded claims for misappropriation of trade secrets and patent infringement. Its unfair competition claim is sufficiently based on these independent substantive law violations to preclude dismissal.").

### B. NIA's Counterclaims Against BNI

#### 1. Monopolization (Sherman Act § 2)

"Section 2 bans attempts to monopolize or monopolization of 'any part of the trade or commerce among the several States.'" *BRFHH Shreveport, LLC v. Willis-Knighton Medical Ctr.*,

49 F.4th 520, 528 (5th Cir. 2022) (quoting 15 U.S.C. § 2). "The first element of a Section 2 actual-monopolization claim is 'possession of monopoly power.'" *Id.* (quoting *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992)). The second element is "anticompetitive (or 'exclusionary') conduct," which "is 'the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Id.* (quoting *Eastman Kodak*, 504 U.S. at 482–83). "The possession of monopoly power requires that the defendant dominate the relevant market." *Zhejiang Medicine Co., Ltd. v. Kaneka Copr.*, Civ. Action No. H-11-1052, 2012 WL 12893418, at *2 (S.D. Tex. Aug. 13, 2012).

The same alleged conduct underlies NIA's counterclaims for both monopolization and attempted monopolization. NIA alleges that BNI "maintains a dominant position in the relevant U.S. market for business referral and networking organization services," with 86.8% of the U.S. chapter share and 89.1% of total U.S. membership. (Docket Entry No. 47 ¶ 54). NIA alleges that BNI's anticompetitive conduct includes the "sweeping restrictions" in its Member Agreements barring members from joining competing organizations as well as its similarly restrictive non-competes for its employees. (*Id.* ¶¶ 57, 59). NIA points to BNI's "pattern of sham litigation" as demonstrated by BNI's cease-and-desist letters for conduct based on information obtained from BNI's publicly available membership lists. (*Id.* ¶ 66). NIA also alleges that BNI has a "high churn rate" in that 40% of BNI members fail to renew their membership annually, which is "indicative of systemic dissatisfaction and a reliance on coercive mechanisms, including restrictive agreements, to prevent member attrition." (*Id.* ¶ 33).

BNI has moved to dismiss the § 2 monopolization claim on various grounds. First, BNI argues that NIA has failed to "plausibly allege the size of any relevant market, the market shares of any other competitors in that alleged market, substitute services available in any alleged market, or cross-elasticity of demand within that market." (Docket Entry No. 53 at 7). Second, BNI alleges that NIA has failed to plausibly allege that BNI has market power. (*Id.*). Third, BNI argues that NIA has failed to plausibly plead that BNI used monopoly power to engage in exclusionary conduct because "non-compete agreements alone are legally insufficient to form the basis of a monopolization claim." (*Id.*). Fourth, NIA fails to allege that it has suffered an "antitrust injury" because it pleads only an alleged injury to itself, rather than to competition as a whole. (*Id.*).

The court addresses each argument in turn.

### i.    The Relevant Market

"In ascertaining the relevant product market, courts consider the extent to which the seller's product is 'interchangeable in use' and the degree of 'cross-elasticity of demand between the product itself and substitutes for it.'" *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (quoting *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir. 1985)). "Whether a relevant market has been identified is usually a question of fact; however, in some circumstances, the issue may be determined as a matter of law." *Id.* at 628. "[T]he 'less stringent standard of pleading' at the motion-to-dismiss stage 'does not relieve [a plaintiff] from its obligation to allege facts sufficient to support an antitrust violation.'" *Rx Sols., Inc. v. Caremark, L.L.C*, 164 F.4th 436, 442 (5th Cir. 2026) (second alteration in original) (quoting *Apani*, 300 F.3d at 633). "The relevant market has two components: a product market and a geographic

market." *Id.* (quoting *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 454 (5th Cir. 2021)). "A failure to substantiate either one will result in dismissal." *Id.*

"Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 378 (E.D. La. 2013) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001)). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted." *Apani*, 300 F.3d at 628.

BNI argues that the amended counterclaims "fail[] to propose a relevant product market with reference to all interchangeable substitute products or to the cross-elasticity of demand" for BNI's services, as required to plausibly plead a § 2 claim. (Docket Entry No. 53 at 13 (quoting *Big River Indus., Inc. v. Headwaters Res., Inc.*, 971 F. Supp. 2d 609, 617 (M.D. La. 2013)). BNI argues that NIA's pleading deficiencies are "underscored" by NIA's allegation that 40% of BNI members leave BNI every year. (*Id.*). BNI also argues that NIA has not plausibly defined the geographic market because the amended counterclaims are "devoid" of allegations as to market size, cumbersomeness and other details that are relevant to defining the geographic market. (*Id.* at 14). BNI argues that because NIA alleges that it only operates in 25 states, the relevant

25

geographic market cannot be the whole country. (*Id.* at 15). BNI points out that NIA's counterclaims allege that NIA and BNI functionally operate at the local level. (*Id.*). The first argument fails but the second succeeds.

NIA's counterclaims adequately allege the relevant product market. NIA alleges that the relevant product market is the market for "business referral and networking organization services." (Docket Entry No. 47 ¶ 54). NIA alleges that BNI similarly defines the competitive market, because BNI includes in its contracts restrictions that prevent members from joining "any other program that holds Members accountable to pass referrals" during their BNI membership and for six months after they unsubscribe from BNI. (*Id.* ¶ 57). NIA alleges that there are several other companies that are competitors of BNI, including Master Networks and LeTip. (Docket Entry No. 47 ¶¶ 17, 18). This allegation details where consumers could "practicably obtain" similar business referral and networking services, *Shah*, 985 F.3d at 455, should either NIA or BNI raise prices, *see Dr.'s Hosp. v. Se. Med. All.*, 123 F.3d 301, 311 (5th Cir. 1997).

NIA also addresses "interchangeable substitutes." *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1037 (5th Cir. 2023). NIA alleges that its business referral and networking services provide "structured monthly meetings, advanced technology, and personalized support," which allow members to form "long-term, meaningful relationships," track referrals, and generate business or digital engagement. (Docket Entry No. 47 ¶ 14). NIA alleges that these services differ meaningfully from "traditional chambers of commerce or informal meet-ups" because they are "professionally managed, branded, and technology-enabled, governed by national franchise or corporate structures." (*Id.* ¶ 18). That

26

BNI's exclusive-dealing clauses apply to "any other program that holds Members accountable to pass referrals," (*Id.* ¶ 57), suggests that BNI agrees with NIA's market definition. NIA appropriately "focus[es] on the product," *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010), and "its pertinent characteristics of elasticity," *Big River Indus., Inc.*, 971 F. Supp. 2d at 617; *see Fed. Trade Comm'n v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 417 (S.D.N.Y. 2024) ("[H]igher-quality, higher-priced products may constitute a separate market than lower-quality, lower-priced products."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) (acknowledging that "'price/quality' differences, where they exist, . . . may be of importance"); *see, e.g.*, *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1225 (C.D. Cal. 2012) (denying a motion to dismiss because the complaint explained in qualitative terms why certain "conceivably interchangeable substitutes" were not "specialized to the needs" of the plaintiff's and defendant's customers); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 958 (D. Or. 2018) (denying a motion to dismiss when the complaint alleged that the product's "distinct features" stopped customers from "turn[ing] to [alternatives] in response to" a price increase).

BNI has not identified similar services that achieve the "same purpose[]" for consumers but that NIA failed to consider in defining its proposed market. *PSKS, Inc.*, 615 F.3d at 417. To be sure, NIA bears the burden of adequately alleging the relevant product market. *Iqbal*, 556 U.S. at 678. But the parties *do* compete in *some* market. *Contra Twombly*, 550 U.S. at 564–70 (holding that the complaint did not allege facts to plausibly show that an agreement existed at all). BNI does not explain why NIA's proposed mark is flawed or impossible, as opposed to merely scantly

alleged.   Dismissal is warranted when the proposed market "*clearly* does not encompass" substitute services.  *Apani*, 300 F.3d at 626 (emphasis added); *see Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*, No. SA-17-CA-1122-FB (HJB), 2020 WL 10051766, at \*15 (W.D. Tex. May 4, 2020) ("[A] motion to dismiss a complaint for failure adequately to plead a relevant antitrust market should be granted only where the alleged market can be deemed patently implausible solely on the basis of the four corners of the complaint." (cleaned up) (alteration added)), *report and recommendation adopted*, No. CV SA-17-CA-1122-FB, 2020 WL 10051760 (W.D. Tex. June 18, 2020).  NIA's counterclaims do not fall below that threshold.

This is not a case in which the alleged market suffers glaring omissions that show the alleged market definition does not exist or is too narrow.  *Cf. In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 438 (S.D.N.Y. 2021) ("[D]efining a Textbook Market as a single textbook is too narrow."); *Shah*, 985 F.3d at 455 (failing to "specify [other] individual pediatric anesthesiologists from whom patients could practicably obtain health care services"); *New Orleans Archdiocesan Cemeteries*, 56 F.4th at 1038 (holding that a proposed market definition of cemetery tours was too narrow because the plaintiff alleged that customers took "combined" tours of multiple historical sites, showing that other types of tours were reasonably interchangeable substitutes).  Nor do NIA's counterclaims define the alleged market in a way that makes it "impossible to imagine that [BNI] could have power over such a market." *PSKS, Inc.*, 615 F.3d at 418; *see, e.g.*, *id.* ("women's accessories"); *Rx Sols.*, 164 F.4th at 443 ("prescription medication market").

Rather, NIA alleges that a few companies in the United States offer high-quality referral services for businesses and that BNI is the dominant player in that market. NIA's allegations are reasonable on their face. *See Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (asking whether a proposed market is "at least . . . theoretically rational" (quoting *Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*, 349 F. Supp. 2d 389, 419 (N.D.N.Y. 2004))); *RealPage*, 852 F. Supp. 2d at 1224 ("facially unsustainable"); *Suture Exp., Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1222 (D. Kan. 2013) ("untenable on its face"). And these cases are consistent with others in this circuit that have denied motions to dismiss based on improperly alleged market definition. *See, e.g.*, *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-03200-N, 2018 WL 2971135, at *4 (N.D. Tex. Mar. 16, 2018) ("hockey trading cards"); *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 634 (W.D. La. 2016) ("general acute-care services, primary care, OB/GYN"); *Nukote of Ill., Inc. v. Clover Holdings, Inc.*, No. 3:10-CV-00580-P, 2012 WL 13093942, at *7 (N.D. Tex. Mar. 15, 2012) ("remanufactured ink jet and laser cartridges").

NIA's counterclaims do not, however, adequately allege the relevant geographic market. Like the product market, the geographic market is a "not a formal, legalistic one" but one that depends on "commercial realities of the industry." *Brown Shoe*, 370 U.S. at 336 (cleaned up). "Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area." *Id.* The "proper question" is not always "where the parties . . . do business or even where they compete, but [is instead] where, within the area of competitive overlap, the effect" of the alleged anticompetitive conduct

29

will be "direct and immediate." *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 357 (1963). The parties dispute whether the alleged market is national or local.

A national market is appropriate when it "reflects the reality of the way in which [the parties] built and conduct their business." *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966). In *Grinnell*, the Supreme Court found a national market for central station home and commercial alarm and watch services despite the fact that individual stations ordinarily served only a radius of 25 miles. *Id.* at 575. The Court relied on findings that the businesses were based on "national planning"; the at-issue agreements "covered activities in many States"; the "inspection, certification and rate-making is largely by national insurers"; and the appellant had "a national schedule of prices, rates, and terms, though the rates [could] be varied to meet local conditions." *Id.*

Based on *Grinnell*, courts have found nationwide markets when the allegedly anticompetitive conduct is part of a nationwide business strategy that results in anticompetitive effects across the country. *See, e.g.*, *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 850 n.24 (5th Cir. 1975) ("The Coca Cola Company and the Bubble Up Company sought to market their syrup concentrate to independent bottlers in all areas of the country to achieve and maintain nationwide distribution at the consumer level."); *In re Pool Prods.*, 940 F. Supp. 2d at 381 (relying on allegations that the products at issue are homogenous, that distribution channels are similar across the country, and that the defendant operates across the entire country); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 130 (D.D.C. 2018) (concluding the plaintiff adequately alleged power in a national market when the defendant had "fifty-one theaters in

twenty-two major geographic markets nationwide"); *Republic Tobacco v. N. Atl. Trading*, 381 F.3d 717, 738 (7th Cir. 2004) (finding a national market for roll-your-own cigarette paper because suppliers sold to national wholesalers and published national price lists); *Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n*, No. 3:08–CV–0158–G, 2008 WL 4146022, at *12 (N.D. Tex. Sep. 9, 2008) (concluding that a nationwide market for physical therapy was sufficiently alleged because "the alleged anticompetitive conduct . . . takes place on a national scale, and, to the extent it can be proven, stands to affect [athletic trainers] across the country"); *Tristar Invs., Inc. v. Am. Tower Corp.*, No. 3:12-CV-0499-M, 2014 WL 1327663, at *16 (N.D. Tex. Apr. 3, 2014) (finding a national market when the parties were competing for land rights under cell towers across the county, which included more than 135,000 cell tower sites).

By contrast, if the market participants' business strategies vary greatly across the country or if consumers do not purchase the relevant good or service from suppliers across the country, courts have found an inadequate basis to define a national market. *See, e.g.*, *Philadelphia Nat. Bank*, 374 U.S. at 361 (defining the relevant market as the "four-County Philadelphia metropolitan area" because that area reflected the average distance large and small borrowers and depositors were willing to travel for banking services); *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 349 (5th Cir. 2012) (distinguishing *Grinnell* because the defendants' prices and marketing strategies varied greatly across locales, and the defendants used special, individual contracts with consumers); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, No. 2328, 2016 WL 3567059, at *7–8 (E.D. La. July 1, 2016) (concluding that the summary-judgment evidence did

31

not establish a nationwide market because there was "concrete evidence of predominantly localized buying").

Under these principles, NIA's counterclaim allegations leave "ambigu[ous]" the relevant geographic market. *Twombly*, 550 U.S. at 554. Some allegations support finding a national market. For example, NIA alleges that BNI has over 3,700 chapters across the country, and NIA has around 188 chapters across 25 states. (Docket Entry No. 47 ¶ 17). A quick look at BNI's website, which has been incorporated by reference in NIA's counterclaims, shows that BNI has chapters across the entire country. (*See id.* ¶ 17 n.3). NIA further alleges that BNI uses its restrictive membership, leadership, and employment agreements across the country, preventing NIA from breaking into any market. (*See id.* ¶¶ 54–67). But some allegations in NIA's counterclaims suggest that the relevant market(s) may be more localized. The counterclaim allegations discuss "monthly meetings," "in-person engagement," "local customization to meet unique community need," and individual chapters throughout the country, (*see id.* ¶¶ 14–20), which suggest that there may be a consumer desire for "predominantly localized" business referral services, *In re Pool Prods.*, 2016 WL 3567059, at \*8. The counterclaims are silent on who uses referral services and whether their business needs make the market for BNI and NIA's services local or national. Those facts matter. *See Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir. 2002); *In re Pool Prods.*, 2016 WL 3567059, at \*8.

Because NIA has not adequately alleged a geographic market, the motion to dismiss is granted, without prejudice. NIA has leave to amend, because amendment is unlikely to be futile.

###### ii.   Monopoly Power

"Monopoly power is the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc) (per curiam). A plaintiff may prove monopoly power directly or indirectly. "Where evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear." *Id.* (first citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); and then citing *Fed. Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)). But "[d]irect evidence of such pricing power is 'rarely available.'" *United States v. Google LLC*, 747 F. Supp. 3d 1, 107 (D.D.C. 2024) (quoting *Microsoft*, 253 F.3d at 51). "[A] firm need not actually have earned monopoly profits or excluded competition to possess monopoly power." *Id.* at 117. "[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is actually excluded but that power exists to raise prices or exclude competition when it is desired to do so." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 811 (1946). As a result, "courts more typically examine market structure in search of circumstantial evidence of monopoly power." *Microsoft*, 253 F.3d at 51.

"Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Id.* (citing *Rebel Oil*, 51 F.3d at 1434). Judge Learned Hand famously ruled that controlling ninety percent of a given market "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent

would be enough; and certainly thirty-three per cent is not." *United States v. Aluminum Co. of Am. (Alcoa)*, 148 F.2d 416, 424 (2d Cir. 1945); *see, e.g.*, *Eastman Kodak* , 504 U.S. at 481 (holding that evidence of an 80–95% market share, with no readily available substitutes, could constitute a monopoly); *Grinnell*, 384 U.S. at 577–78 (describing a 73% market share as the "keystone of the defendants' monopoly power"); *Google*, 747 F. Supp. 3d at 119 (holding that "an over-80% share" for over a decade was "a durable dominant share"); *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 88–89 (2021) (recognizing that a firm with less than a 10% market share could not pose anticompetitive threats). Common barriers to entry include patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs, economies of scale, or a network of exclusive contracts or distribution arrangements. *Google*, 747 F. Supp. at 117 (first citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997); and then citing *United States v. Syufy Enters.*, 903 F.2d 659, 667 (9th Cir. 1990)). "A plaintiff must not only show that such barriers to entry exist, but that those barriers are 'significant.'" *Id.* (quoting *Microsoft*, 253 F.3d at 82).

NIA's counterclaims include some allegations that plausibly plead BNI's monopoly power. NIA alleges that BNI has an 85-90% share of the "U.S. market for business referral and networking organization services." (Docket Entry No. 47 ¶ 54). NIA's counterclaims then go beyond "bare assertions" of a high market share. *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (collecting cases); *EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-3454-S, 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (ruling that bare allegation of "market share of over 50 percent" was "conclusory"). NIA alleges that BNI has "over

34

3,700 chapters" and more than "73,000 members" in the United States, which exceed the chapter and membership totals of rival firms. (Docket Entry No. 47 ¶ 17). BNI's allegations based on membership are a plausible way to calculate the share of the relevant market; the point of a referral service, after all, is to connect members with each other so that they may generate business. (*Id.* ¶ 16 (noting the number of referrals that BNI generated)). A high membership count is the goal of firms in the relevant market.

NIA's counterclaim adequately alleges "what it is measuring," why that measure is important to the "market at issue," what "underlying facts . . . substantiate" its measurement, and who else makes up the relevant market. *See Facebook*, 560 F. Supp. 3d at 18–20 (concluding that such pleading deficiencies compounded to an implausible allegation of market power, not "some pleading technicality or arcane feature of antitrust law"). To boot, NIA alleges that BNI erected barriers to entry, *see Google*, 747 F. Supp. at 117, through a series of exclusive-dealing arrangements with customers and non-compete agreements with employees, (Docket Entry No. 47 ¶¶ 33–52). NIA's counterclaim includes allegations that establish the relevant elements of monopoly power.

The issue, as BNI points out, is that NIA's counterclaims plead some facts that contradict its allegations of BNI's monopoly power: (1) NIA alleges that "more than 40% of new BNI members fail to renew their membership annually," (Docket Entry No. 47 ¶ 33); and (2) NIA's website, which is incorporated by reference in the counterclaim, states that BNI has "only 1% market share," (Docket Entry No. 61 at 9–10). If, "as NIA alleges, 40% of BNI's members are able to leave at the end of any given year, they cannot be 'locked in.'" (Docket Entry No. 61 at 5).

35

According to BNI, that means that "NIA's own Amended Counterclaims expressly allege that BNI's members are 1) free to leave BNI, and 2) do leave with frequency – the opposite of what customers do when a company has a monopoly." (*Id.*). And if, as NIA's website maintains, BNI has only a 1% market share, then NIA's monopoly claims fail. *Alston*, 594 U.S. at 89. These allegations, if taken as true and as BNI interprets them, pose problems for NIA's claims.

NIA offers some explanations. For the churn-rate allegation, NIA argues that "demand does not represent switching to rival organizations but often reflects movement within BNI's network or inactive status." (Docket Entry No. 58 at 10). The point, according to NIA, is that even dissatisfied customers cannot switch away from BNI, making it difficult for entities like NIA to compete and causing customers to drop out of the referral market entirely. *See Eastman Kodak*, 504 U.S. at 476–77 (discussing switching costs). NIA did not have a chance to respond to BNI's arguments about NIA's website concessions because BNI raised it only in its reply. *See United States v. Muhammad*, 14 F.4th 352, 363 n.3 (5th Cir. 2021) ("Litigants may not raise arguments for the first time in a reply brief."). But the court could infer that NIA's counterclaims and website use the term "market share" differently: market share in the counterclaims refers to the number of members in the market (current customers), and market share on the website refers to the number of potential members (future customers). The court is not obligated to "strain to find inferences favorable to the plaintiff[]," *Southland Secs. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)), especially when "[a] plaintiff's own pleadings are internally inconsistent," *Cicalese v. Univ. of Tex. Med. Branch*, 456 F. Supp. 3d 859, 866 (S.D. Tex. 2020) (quoting *Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d

36

247, 255 (E.D.N.Y. 2016)). The better course is for NIA to amend its counterclaim to see if it can resolve these inconsistencies.

NIA has leave to amend to attempt to allege BNI's monopoly power.

### iii.    Monopolization and Exclusionary Conduct

"Having or acquiring a monopoly is not in and of itself illegal." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015). "A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 58 (quoting *Grinnell*, 384 U.S. at 571); *see Alcoa*, 148 F.2d at 430 ("The successful competitor, having been urged to compete, must not be turned upon when he wins."). Exclusionary conduct must have an anticompetitive effect. "That is, it must harm the competitive process and thereby harm consumers." *Microsoft*, 253 F.3d at 58 (emphasis omitted). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws," *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993), because the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself," *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

Generally, after a full trial on the merits, courts balance the alleged misconduct's anticompetitive and procompetitive effects. *Alston*, 594 U.S. at 96–101; *Microsoft*, 253 F.3d at 58–59; *see Texaco Inc. v. Dagher*, 547 U.S. 1, 5–8, 7 nn.2–3 (2006) (explaining that courts do not

consider procompetitive effects when the alleged misconduct falls into a category of activity that is so obviously anticompetitive that it is *per se* unlawful); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7–8, 13, 15–16, 19–24 (1979) (same). A plaintiff has the initial burden of establishing a prima facie showing of anticompetitive monopolization under § 2. *See Microsoft*, 253 F.3d at 58–59. If the plaintiff meets this burden, "then the monopolist may proffer a 'procompetitive justification' for its conduct." *Id.* at 59 (quoting *Eastman Kodak*, 504 U.S. at 483). "If the monopolist asserts a procompetitive justification—a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to the plaintiff to rebut that claim." *Id.* "[I]f the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id.*; *see also Mid-Tex. Commc'ns Sys., Inc. v. AT&T*, 615 F.2d 1372, 1389 n.13 (5th Cir.1980) (citing *Byars v. Bluff City News Co.*, 609 F.2d 843, 860 (6th Cir.1979)).

At the pleading stage, courts focus on the plaintiff's prima facie showing of anticompetitive harm. *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal. 2008) ("[T]o survive dismissal Plaintiffs are required only to establish a *prima facie* case."); *accord United States v. Apple, Inc.*, No. 24-CV-4055, 2025 WL 1829127, at *12 (D.N.J. June 30, 2025). NIA alleges that BNI achieved its monopoly power through "restricted contractual provisions, retaliatory sham litigation, and efforts to fabricate non-compete agreements." (Docket Entry No. 47 ¶ 71). NIA may allege monopolization by pleading facts that could show either that any of these allegedly exclusionary acts are independently exclusionary or that BNI's entire "course of

conduct" is exclusionary.  *See Microsoft*, 253 F.3d at 78; *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.").  Under a course-of-conduct approach, a plaintiff may "point to any series of acts, each of which harms competition only slightly but the cumulative effect of which is significant enough to form an independent basis for liability."  *Microsoft*, 253 F.3d at 78; *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980) (although "no one of the instances of improper conduct, standing alone, would lead to section 2 liability," they may "show a pattern of exclusionary behavior" when "[t]aken together"); *Drs. Hosp. of Laredo v. Cigarroa*, 782 F. Supp. 3d 406, 451 (W.D. Tex. 2025) ("When analyzing whether there are anticompetitive effects, courts measure the cumulative effect of the defendant's conduct, rather than each instance of conduct in isolation.").

The court first addresses the subscription restrictions on members (customers) and the noncompetition agreements (employees).  Then it addresses the sham-litigation allegations.  The conclusion is that NIA must amend its counterclaims to adequately allege a *prima facie* claim of anticompetitive conduct.

First, the subscription restrictions on members and the noncompetition agreements.  NIA alleges that BNI forces its members (the consumers of BNI's referral services) to sign agreements that "prohibit members from joining any other referral organization during their time with BNI and for six months after."  (Docket Entry No. 47 ¶ 73).  NIA also alleges that BNI imposes or attempts to impose noncompetition agreements on employees.  (*Id.* ¶¶ 74–78).  Although both

39

types of agreements may unlawfully restrain trade, they are generally lawful. *See United States v. Empire Gas Corp.*, 537 F.2d 296, 307 (8th Cir. 1976) (citing *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 119 (1948)).  After all, "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.).  Such contracts cannot be condemned *per se*.  Imposing another form of heightened review, such as a quick-look review, may cause courts to skip past their procompetitive effects, including the "enhancement of interbrand competition," *Omega Env'l., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), or the development of business goodwill or trade secrets, *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 434 (S.D. Tex. 2008).  As a result, courts apply the rule of reason when plaintiffs allege that such agreements are anticompetitive.  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (exclusive-dealing contracts); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984) (Posner, J.) (exclusive-dealing contracts); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 664–65 (7th Cir. 2015) (noncompete agreements); *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1562–64 (11th Cir. 1983) (noncompete agreements).

In *Tampa Electric*, the Supreme Court held that an exclusive-dealing contract does not violate the Clayton Act (or the Sherman Act)[8] "unless its probable effect is to 'foreclose

---

[8] Whether the Clayton Act and Sherman Act impose different standards on exclusive-dealing arrangements is unclear. *See Microsoft*, 253 F.3d at 69.  In *Stitt Spark Plug Co. v. Champion Spark Plug Co.*, 840 F.2d 1253, 1255, 1257–58 (5th Cir. 1988), the Fifth Circuit noted that the plaintiff brought an exclusive-dealing claim under the Clayton and Sherman Acts but addressed only the Clayton Act when it analyzed the claim.

competition in a substantial share of the line of commerce affected.'" *Microsoft*, 253 F.3d at 69 (quoting *Tampa Elec.*, 365 U.S. at 327). "[W]hat is 'significant' may vary depending upon the antitrust provision under which an exclusive deal is challenged." *Id.* "Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching 'the critical level necessary' to pose a real threat to the defendant's business." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)). Foreclosure of 40% to 50% of the relevant market is usually required to establish unlawful exclusive-dealing contracts, although foreclosure levels under 40% may still give rise to a § 2 claim (even if not a § 1 claim) in "certain circumstances." *Microsoft*, 253 F.3d at 70. After assessing the amount of foreclosure, courts "look to certain qualitative conditions" to assess "a foreclosure percentage's significance." *Google*, 747 F. Supp. 3d at 157; *see Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) ("[W]hile low [foreclosure] numbers make dismissal easy, high numbers do not automatically condemn, but only encourage closer scrutiny . . . ."). Courts consider "the duration of the exclusive agreements, their ease of terminability, the height of barriers to entry, the availability of alternative methods of distribution, and the willingness of consumers to comparison shop." *Google*, 747 F. Supp. 3d at 157; *see id.* 157–59 (collecting cases and assessing these factors).

The test is whether BNI is substantially foreclosing access to the relevant market. The issue is the difference between the restrictive provisions in membership contracts and employment contracts. They operate in different markets. The former operates in the consumer market (in which BNI would exercise monopoly power as a seller), and the latter in the labor market (in which

41

BNI would exercise monopoly power as a buyer). *See Alston*, 594 U.S. at 86–87 (distinguishing between monopoly and monopsony power and consumer and labor markets); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320–26 (2007) (discussing the difference between monopoly and monopsony power). There is good reason to treat the membership contracts differently from the noncompetition agreements. Even if BNI has allegedly locked up a substantial portion of the membership market, that does not mean that it has locked up the market of potential employees that NIA could hire to operate and expand its business. NIA's counterclaim contains no allegation that, because of BNI's noncompete agreements, NIA has been unable to hire workers and compete for members. *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) (acknowledging that parties may leverage monopoly power or anticompetitive conduct in one market to maintain or gain monopoly power in "a second market"); *cf. Alston*, 594 U.S. at 86–87 (noting that the defendant did not argue that the plaintiffs must show harm "in the seller-side (or consumer facing) market as well as in its buyer-side (or labor) market" and leaving open the question whether the benefits to one market can justify the harms to the other).

NIA's allegations about the membership contracts fare better, but not enough to survive dismissal as currently pleaded. NIA alleges that BNI has "89.1% of total U.S. membership." (Docket Entry No. 47 ¶ 69). That figure far exceeds the usual 40-50% of market foreclosure needed to state a claim. *See LePage's*, 324 F.3d at 159; *Microsoft*, 253 F.3d at 70. But a high market share combined with exclusive-dealing tactics does not alone constitute anticompetitive conduct. The amount of time for which consumers are locked up is important. Courts routinely

42

permit exclusive-dealing contracts of a relatively short duration, such as around one year. *See FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 393–96 (1953) (upholding contracts of one year or less, but holding unlawful contract terms ranging from two to five years); *ZF Meritor*, 696 F.3d at 286–87 (collecting cases). Courts also recognize that early-termination provisions mitigate the harm of long-term contracts. *See Denison Mattress Factory v. Spring–Air Co.*, 308 F.2d 403, 412 (5th Cir. 1962) (finding an exclusive-dealing contract permissible because it was terminable without cause in six months); *Roland Mach. Co.*, 749 F.2d at 395 ("Exclusive-dealing contracts terminable in less than a year are presumptively lawful under section 3" of the Clayton Act); *accord Stitt Spark Plug Co. v. Champion Spark Plug Co.*, 840 F.2d 1253, 1258 n.18 (5th Cir. 1988) (acknowledging that exclusive-dealing contracts of less than a year are presumptively lawful). When market participants can exit contracts relatively easily, "a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022). In addition, there may be low barriers to entering the market. *See Google*, 747 Supp. 3d at 158–59.

Neither NIA's counterclaims nor the parties' briefs address these considerations. BNI's contracts with substantially all the members in the market appear indefinite, and terminable at will, but they prevent switching to another provider for six months after cancellation. (*See* Docket Entry No. 47 ¶¶ 57, 73, 94). *Compare Roland Mach. Co.*, 749 F.2d at 395 (suggesting that easy terminability makes contracts presumptively lawful), *with United States v. Dairymen, Inc.*, No. C 7634 A, 1983 WL 1880, at *9 (W.D. Ky. June 9, 1983) (holding unlawful one-year exclusive-

dealing contracts because the defendant had a 59.5% market share), *aff'd*, 758 F.2d 654 (6th Cir. 1985).  The exclusive-dealing requirement in the BNI contracts precludes a customer from turning to another service provider even *after* he or she stops purchasing services from BNI.  The contract does not just "lock-in" consumers but ultimately locks them out of the market altogether, likely decreasing their willingness "to comparison shop."  *See Google*, 747 Supp. 3d at 158.  No allegations in NIA's counterclaims address whether, even if NIA cannot compete for BNI's customers, it can compete by attracting new customers.  NIA does not address whether, although there is a large barrier to solicit BNI's customers, there is a sufficiently large pool of potential consumers to enable NIA to effectively compete.  (*Cf.* Docket Entry No. 58 at 1, 5–6 (disputing how to interpret BNI's high churn rate)).  NIA's exclusive-dealing allegations still lack facts necessary for it to proceed.  NIA has leave to amend the counterclaims one last time to plead the fact necessary to overcome dismissal.

The second issue is whether NIA sufficiently pleads that BNI engaged in sham litigation. The Supreme Court has recognized that the Sherman Act may impose liability for petition activity that while, "ostensibly directed toward influencing governmental action," is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *see also Mine Workers v. Pennington*, 381 U.S. 657, 669 (1965).  In *California Motor*, the Supreme Court extended *Noerr* to litigation.  *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 512 (1972).  The Court held that First Amendment immunity did not shield the defendants because the plaintiff alleged that one group of highway carriers "sought to bar . . .

44

competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process" by "institut[ing] . . . proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases." *Id.* at 512 (last alteration in original) (internal quotations omitted). To prevail on a sham-litigation claim, a plaintiff must show that the underlying lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). The plaintiff must also show that the baseless litigation was "an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* at 60–61 (cleaned up).

NIA's counterclaim does not adequately allege sham litigation. NIA alleges only that this lawsuit and prelitigation events leading up to it are a sham. (Docket Entry No. 47 ¶¶ 66). NIA does not allege that BNI is targeting other competitors in the marketplace or otherwise repeatedly harassing NIA over a period of years. *Cf. Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 365 (4th Cir. 2013) (discussing a litigant's "win-loss percentage" over a series of suits). NIA's sole focus is on this litigation, which the court has not yet dismissed; several of BNI's claims survive the pleading stage. *Cf. Columbia Pictures*, 508 U.S. at 62 ("The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation."); *Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*, 207 F.Supp.2d 221, 224 (S.D.N.Y.2002) (no sham litigation where the court allowed "four of the six asserted patents to proceed beyond summary judgment."). Even if some of BNI's

45

claims lacked probable cause—and NIA has not identified which ones in particular do—it still has not alleged that those individual, baseless claims had an anticompetitive effect. NIA's counterclaim does not survive the motion to dismiss.

For these reasons, NIA's monopolization claim is dismissed, without prejudice. NIA has leave to amend, including on its allegations of exclusive dealing and sham litigation.

### iv.    Antitrust Injury

When a private plaintiff brings an antitrust claim, the plaintiff must show that its injury is "of 'the type that the statute was intended to forestall.'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 487–88 (1977) (quoting *Wyandotte Transp. v. United States*, 389 U.S. 191, 202 (1967)). Congress enacted the antitrust laws for "the protection of *competition*, not *competitors*," *Brown Shoe Co.*, 370 U.S. at 320, so an antitrust plaintiff "must demonstrate that the monopolist's conduct harmed competition, not just a competitor," *Microsoft*, 253 F.3d at 59. As the Fifth Circuit has stated,

> The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation. Typical anticompetitive effects include increased prices and decreased output. This circuit has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition.

*Anago, Inc. v. Tecnol Med. Prods.*, 976 F.2d 248, 249 (5th Cir. 1992) (cleaned up). The Fifth Circuit has "rejected the idea that 'the competitor of a monopolist always has standing to challenge the monopolistic conduct forcing it from the market.'" *Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, 113 F.4th 511, 528 (5th Cir. 2024) (quoting *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100 (5th Cir. 1988)). "Though the 'threat of decreased competition' is not enough to

establish antitrust injury," *Tesla, Inc.*, 113 F.4th at 528 (quoting *Anago*, 976 F.2d at 249), "competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened," *Brunswick Corp.*, 429 U.S. at 489 n.14.

NIA has not adequately alleged an antitrust injury. NIA has not adequately alleged that consumers have suffered higher prices, reduced output, or lower quality services due to BNI's monopolistic conduct. *See Anago*, 976 F.3d at 251 (focusing on price and output); *Microsoft*, 253 F.3d at 56 (focusing on product quality); *Google*, 747 F. Supp. at 118, 171 (same). NIA has not alleged, for example, that it offers lower prices than BNI does, which consumers cannot benefit from because of BNI's exclusionary conduct. Nor does it show how it offers a better product than BNI does; it only compares its services to traditional chambers of commerce or informal in-person meetups. (Docket Entry No. 47 ¶ 18). Although NIA alleges that BNI's high churn rate demonstrates that BNI has an inferior product, (*id.* ¶¶ 33–35), for the reasons already discussed, the churn-rate allegations are of ambiguous import. NIA's counterclaims do not adequately allege that BNI's monopolistic conduct harms consumers.

The claim of monopolization is dismissed, without prejudice, and with leave for NIA to amend to adequately allege an antitrust injury.

### 2.    Attempted Monopolization (Sherman Act § 2)

To plead attempted monopolization, a plaintiff must show: "(1) the defendant engaged in predatory or exclusionary conduct, (2) the defendant had a specific intent to monopolize, and (3) there was a dangerous probability that the defendant would successfully attain monopoly power." *Taylor Pub. Co.*, 216 F.3d at 474. The latter two elements distinguish monopolization claims from

attempted monopolization claims. The third element shows that one does not need monopoly power to attempt to monopolize a market. *Compare Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490–91 (5th Cir. 1984) (permitting allegations of attempted monopolization based on 20–50% market share, depending on the relevant facts), *with Alcoa*, 148 F.2d at 424 (explaining that ninety percent of a given market "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three per cent is not"). Attempted monopolization claims are limited to those who act with the intent to destroy competition. *Compare Alcoa*, 148 F.2d at 429–30 (holding that specific intent requires an intent "to put an end to existing competition, or to prevent competition from arising when none had existed"), *with Microsoft*, 253 F.3d at 59 ("our focus is upon the effect of that conduct, not upon the intent behind it").

BNI's motion to dismiss and reply argue that NIA's attempted monopolization claim fails for the same reasons as its monopolization claim. (Docket Entry No. 53 at 22–23; Docket Entry No. 61 at 12–13). BNI mentions specific intent only in passing. Because the flaws in NIA's monopolization claim also apply to its attempted monopolization claim, NIA's attempted monopolization claim is dismissed, without prejudice, and with leave to amend.

### 3. Monopolization or Attempted Monopolization (Texas)

The Texas Legislature has explained that the Texas Free Enterprise and Antitrust Act was to be "construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose." *McPeters*, 11 F. Supp. 3d at 796 (quoting TEX. BUS. & COM. CODE § 15.04). The Texas Supreme Court has clarified that "[b]ecause section

48

15.05(b) of the Texas Antitrust Act is comparable to section 2 of the Sherman Antitrust Act, we look to federal law interpreting section 2 of the Sherman Act for guidance in interpreting section 15.05(b) of the Texas Antitrust Act." *Id.* (quoting *Caller-Times Pub. Co., Inc. v. Triad Commc'ns, Inc.*, 826 S.W.3d 576, 580 (Tex. 1992)).  In other words, "[c]laims plead under Section 15.05(b) must therefore establish the same elements required under Section 2 of the Sherman Act." *Zhejiang Med. Co.*, 2012 WL 12893418, at *3.  Because NIA's claims under the Sherman Act are dismissed with leave to amend, so are its monopolization claims under Texas law.

### 4.    Unfair Competition (Texas Law)

As discussed, unfair competition under Texas law is not a stand-alone claim.  "The cause of action must be grounded by the defendant's breach of some independently-recognized duty." *Eli Lilly & Co. v. Revive Rx, LLC*, ___ F. Supp. 3d ___, 2025 WL 3640703, at *6 (S.D. Tex. Dec. 15, 2025).  Because NIA's monopolization claims are dismissed without prejudice, so too is its unfair-competition claim.

### 5.    Declaratory Judgment

NIA "seeks a declaration that BNI's restrictive covenants and non-competes in its member, leadership, and employee agreements are unenforceable under federal and state law due to their anti-competitive nature." (Docket Entry No. 47 ¶ 102).  The Declaratory Judgment Act, 28 U.S.C. § 2201, "permits federal courts to award declaratory relief, but it does not offer an independent ground for jurisdiction" or relief. *Union Pac. R.R. Co. v. Harris County*, 790 F. Supp. 2d 568, 574 (S.D. Tex. 2011) (citing *TTEA v. Ysleta del Sur Pueblo*, 181 F.3d 676 (5th Cir. 1999)); *see also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937).  As a result, NIA's declaratory-judgment

claim is dismissed, with prejudice, to the extent such relief is inappropriate under its other adequately alleged, substantive causes of action.

## IV. Conclusion

The court grants in part and denies in part NIA's motion to dismiss the third amended complaint. (Docket Entry No. 74). The court grants BNI's motion to dismiss the amended counterclaims. (Docket Entry No. 53). NIA may have one more chance to amend its counterclaims and must do so no later than April 17, 2026. The court grants the stipulation to dismiss the DTSA and TUTSA claims. (Docket Entry No. 87). Those claims are dismissed, with prejudice.

SIGNED on March 24, 2026, at Houston, Texas.

Lee H. Rosenthal
Senior United States District Judge